## In re HOBBS & CO.

### (District Court, N. D. West Virginia. April 17, 1906.)

1. BANKRUPTCY—JURISDICTION OF COURT—CONTROVERSIES BETWEEN THIRD PERSONS.

Under the general powers conferred on courts of bankruptcy, by Bankr. Act July 1, 1898, c. 541, § 2, (67), 30 Stat. 545 [U. S. Comp. St. 1901, p. 3421], to cause the estates of bankrupts to be collected and distributed, to determine controversies in relation thereto and bring in additional parties when necessary for the complete determination of a controversy, the test of jurisdiction to determine matters in controversy between third persons is the necessity of doing so in order to administer the estate.

2. SAME.

Where a firm of building contractors was adjudged bankrupt, having on hand at the time uncompleted contracts for buildings against which mechanics' liens had been filed by persons who had furnished labor and materials to the bankrupts, which contracts it is necessary to complete to obtain payment from the owners and avoid loss to the estate, the court of bankruptcy has jurisdiction to bring in the lien claimants and adjudicate the validity of their liens, so far as they affect the balance due under the contracts as a necessary condition precedent to a settlement between the bankrupts and the owners.

3. MECHANICS' LIENS—WEST VIRGINIA STATUTE—RECORDING OF CONTRACT.

Under the provision of the mechanic's lien law of West Virginia (Code 1899, c. 75, § 5), requiring the owner, in order to limit his liability to lienholders to the contract price to record his contract with the county clerk, "or so much thereof as shows the contract price and the times of its payment," such contract need not be acknowledged to be entitled to record.

4. BANKRUPTCY—ENFORCEMENT OF MECHANICS' LIENS ON BUILDINGS ERECTED BY BANKRUPTS.

Various mechanic's lien claims, under the statute of West Virginia, against buildings in course of erection by a bankrupt firm, considered, and adjudicated in so far as they affected the amount due from the owners to the bankrupts under their contracts.

## In Bankruptcy. On report of special master.

On April 21, 1904, the Randolph National Bank, James P. Tenley, and Robert Spurling filed in this court their petition against the firm of Hobbs & Co., composed of Frank N. Hobbs, Robert M. Boyle, and Lewis E. Parkinson, asking that said firm be adjudged bankrupt. On the next day the same parties filed an ancillary petition setting forth that said Hobbs & Co. were building contractors having contracts for building the Davis & Elkins College at Elkins, W. Va., at a contract price of between $40,000 and $50,000, and a business building for W. H. Cobb of the same place for about the same contract price; that there were considerable sums due on said contracts from the owners, but large amounts of mechanic and labor liens had been taken and were being prepared to be taken against said buildings; that said firm was believed to have under contract buildings in Fairmont, W. Va., Morgantown, W. Va., and elsewhere; that the debts and liabilities of said firm would ag-

gregate about $50,000; and that the face value of its assets was about the same, subject, however, to set-offs which would reduce the true value of such assets to between $10,000 and $15,000; that about the 18th day of April, 1904, Frank N. Hobbs, a member of the firm, had absconded with a large amount of the assets, leaving the firm utterly insolvent; that on April 18, 1904, the two other members of the firm, Boyle and Parkinson, had filed their bill in equity in the circuit court of Marion county against Frank N. Hobbs, as sole defendant, charging the criminal conduct of Hobbs and the impairment of the credit of said firm thereby, and praying the appointment of receiver to take charge of and protect the remaining assets of the firm from his control; that on that day receivers had by said state court been appointed in the persons of E. M. Showalter and J. P. Kirby, who duly qualified as such. The prayer is that Hobbs, Boyle, and Parkinson, as individuals and as composing the firm of Hobbs & Co., and Showalter and Kirby, receivers, be made defendants, and that a receiver be appointed for said firm by this court. Upon this petition, on said April 22, 1904, an order was entered by this court appointing W. H. Cobb and E. M. Showalter temporary receivers for said firm, and directing tnem to take possession of the property, collect outstanding debts, institute suits for that purpose, ascertain and report the assets and what contracts remained unexecuted, the cost of completion, and the amounts unpaid by the owners thereon, and, in order to do this, authorizing them to employ a skilled builder to assist in making estimates.

On May 25, 1904, the original petitioners filed an amended petition, in which they allege that it has appeared since the filing of their original petition that said firm had five large contracts, one for the erection of a building for the state at the University for about $13,000, two for C. W. Watson at Fairmont, aggregating about $25,000, one for W. H. Cobb for about $38,000 and one for the Davis & Elkins College for about $48,000; that it would cost $1,263 to finish the Cobb house upon which event there would be due from Cobb $3,923; that $2,900 would complete the Davis & Elkins College Building, when $7,442 would be due from that corporation; that to complete the two Watson houses would cost for the one $6,700 and $7,000 would then be due therefor, for the other $3,300, when $7,448 would be due thereon; that the contract with the state for the University had been canceled; that the debts of said firm aggregated about $50,000 and its assets would not exceed $20,000; that material purchased by said firm was on the grounds, ready to be placed in said houses, and all that would be necessary would be to employ and pay the labor involved to complete said contracts; that not to utilize said material in said buildings for which it had been specially prepared would be to make it almost entirely valueless, while for the owners to have to buy new material and complete their respective buildings would absorb all of the contract prices; that a large number of mechanics' and materialmen's liens had been taken upon said several buildings, some valid, others not, and that the Kane & Keyser Hardware Company had instituted a suit to assert such a lien for nearly $2,500 against the Cobb building, and other suits were threatened to the imminent danger of great loss to the assets of said bankrupt firm; that the wife of Hobbs was seeking to withdraw assets of said company; that judgments were being taken against the firm and material removed by materialmen from the custody of the firm, and the prayer is that receivers be appointed and an injunction be awarded restraining all persons from interfering with their administration of affairs, and especially restraining Kane & Keyser Hardware Company from further proceedings in its suit. The injunction was granted, and process issued thereon.

On May 27, 1904, the usual orders adjudging said firm of Hobbs & Co. and Frank N. Hobbs, Robert M. Boyle, and Lewis E. Parkinson members thereof, as individuals, bankrupt, and referring the case to Geo. P. Shirley, referee, were entered. On May 28, 1904, receivers Showalter and Cobb filed their first report, in which they say they have been unable to collect any of the assets of said firm; that it had five unfinished contracts on hand, one for the University building which the state had canceled, but for work upon which they think $1,500 should reasonably be recovered from the

state of West Virginia; that they had two architects examine the other four buildings and return their estimates with their report, from which they state the amounts necessary to complete the buildings and the amounts then to become due therefor to be substantially as stated above from the amended petition; that Cobb, the Davis & Elkins College, and Watson each has bonds of indemnity from the Ætna Indemnity Company to secure performance of their contracts; that mechanics' liens have been taken, the validity of many in large amounts they doubt; that other assets of said firm are due from the Cook Hospital & Training School, Lon C. Smith, the city of Fairmont, Joseph C. Rider, Ella B., Joseph B., and George C. Murray; that E. M. Showalter executed a note for $736 to the wife of Hobbs which belonged to the firm, and asks that she be required to prove her right thereto, and that material on hand should be at once used to complete the buildings. On the same day an order was entered filing this report, directing the receivers to employ mechanics and proceed to complete the buildings of Cobb and the Davis & Elkins College, to collect as the work progressed the pro rata parts of the contract prices, and apply the same towards paying the construction costs, and, in case either one of the said owners failed to pay, then to borrow money sufficient to complete said buildings, issue certificates, and provide for the payment of the same out of the residue due upon the buildings when completed. This order granted also the injunction against the Kane & Keyser Hardware Company and others above referred to.

At various times in the clerk's office and before Referee Shirley, answers of the Kane & Keyser Hardware Company, the Davis & Elkins College Corporation, W. H. Cobb, C. W. Watson, the S. H. Calkins Company, and Charles C. Hough had been filed, and on July 28, 1904, upon the petitions, these answers, replications thereto, the motion of Kane & Keyser to dissolve the injunction as to it, it was ordered that the motion to dissolve be overruled and said injunction continued, the cause be referred to Referee Shirley as special master to report: First, the material and labor liens against the Cobb lots and buildings; second, such liens upon the Davis & Elkins College property; third, such liens on the Cook Hospital & Training School Company's property; fourth, such liens on the property of Ida M. and Lucy L. Watson. This order further directed all additional necessary parties to be made, and gave leave to petitioners to file another amended petition for that purpose. It then directs said special master to report: First, which of said mechanics' and materialmen's liens against the several buildings arose for labor performed by Hobbs & Co., and whether said liens were perfected before or after the institution of these proceedings; second, what part of the contract prices for said buildings was due at the institution of this suit, all the facts relating to said contracts, and what amounts have been paid by owners to complete their buildings since the appointment of the receivers; third, whether any other liens existed against the real estate of the owners prior to such mechanics' labor and materialmen's liens; fourth, to ascertain the specific real estate bound for said mechanics', etc., liens; fifth, the amount due or to become due to Hobbs & Co. on the Cobb Building at the time of the institution of the suit by Kane and Keyser; sixth, any other pertinent matter. The master is directed to give notice to parties, and leave was then given to all parties claiming labor, mechanics' and materialmen's liens against the Davis & Elkins College and other properties against which suit had not been brought in the state court to institute and mature, but not further prosecute, one suit against each property in the state courts to assert such liens.

On August 19, 1904, the original petitioners filed a second amended petition making new parties, as suggested by the court in the order last referred to, stating that the lots upon which the C. W. Watson houses were being constructed belonged to Ida M. and Lucy L. Watson; that Sallie N. Showalter had recently had a house erected for her by Hobbs & Co.; that mechanics' liens have been taken upon this building, and they do not know the contract price or the status of the work upon the same; that the John R. Cook Hospital & Training School Company had a large building constructed by said bankrupt firm, but it does not know the contract price or the

amount due thereon; that Cobb had executed a deed of trust on his lot to J. F. Harding, trustee, to secure A. B. Serpell $10,000. The prayer is that Ida M. Watson, Lucy L. Watson, John R. Cook, Cook Hospital & Training School Company, Sallie Showalter, J. F. Harding, trustee, and A. B. Serpell be made defendants and answer, and all parties having liens come into this suit and assert the same.

The answers referred to in the decree of the 28th day of July, 1904, need not in this statement to be considered further at this time than to state that the property owners thus answering all seem to admit the jurisdiction and right of this bankrupt court to pass upon and determine the validity of the mechanics', materialmen's and laborers' liens sought to be asserted against their respective properties, but earnestly deny the validity of each and every one of them for reasons that will be more fully considered in the opinion following. Before Special Master Shirley 40 separate and distinct answers of mechanics, materialmen, and laborers were filed setting up liens upon the various properties and filing the record evidence upon which such liens were based. The special master, after months of almost continuous labor, and the taking of an enormous amount of testimony, on the 15th day of September, 1905, filed his report to which the Davis & Elkins College Corporation, W. H. Cobb, Ida M., Lucy L., and Clarence W. Watson, the Cook Hospital & Training School Company, owners, and the Collins Company, the Kane & Keyser Hardware Company, Kelley & Jones, James E. Hanley, L. Creed Wolf, the Elkins Planing Mill Company, the Fairmont Wall Paper Company, and the D. M. Anderson, Mariner Son & Co., lien claimants, have filed voluminous exceptions.

Dailey & Bowers, W. H. Cobb, Charles Powell, G. M. Alexander, and E. M. Showalter, for owners.

Harvey F. Smith, Talbott & Hoover, W. B. Maxwell, D. H. Hill Arnold, W. E. Baker, C. W. Maxwell, J. F. Harding, James A. Bent, S. T. Spears, W. S. Meredith, W. B. Cornwell, P. J. Hoge, Scott Lowe, Tusca Morris, and A. L. Lehman, for claimants.

DAYTON, District Judge (after stating the facts as above). At the threshold of a consideration of this very voluminous record and the many intricate and perplexing questions involved, it becomes absolutely necessary to keep in view constantly the extent of this court's jurisdiction in the premises. As a court of bankruptcy, inasmuch as the firm of Hobbs & Co. and its members as individuals have been properly adjudged bankrupts, it is its plain duty (a) to secure control of all the assets of said firm or its individual members, and (b) disburse such assets to the respective creditors of each—firm assets to firm debts, individual assets to individual debts. Inasmuch as no assets have been found of the individual members, and no debts proven against them as such, they as individuals need not be further considered. In the distribution of the firm assets all its creditors, after the payment of the costs of suit and administration, are entitled to share pari passu, unless liens exist as provided by sections 64, 65, 66, and 67 of the bankrupt act (Act July 1, 1898, c. 541, 30 Stat. 563–565 [U. S. Comp. St. 1901, pp. 3447–3450]), in which case such liens are to be expressly preserved in priority. It is no concern, ordinarily, of this court what collateral controversies may arise between outside parties because of an individual's, firm's or corporation's bankruptcy. Its sole purpose must be, as I have said, to collect the assets and apply the same to the bankrupt's debts. Con-

sent of parties to determine outside and collateral issues between other parties cannot give jurisdiction to this court. Byers v. McAuley, 149 U. S. 608, 13 Sup. Ct. 906, 37 L. Ed. 867; Olds Wagon Works v. Benedict, 67 Fed. 1, 14 C. C. A. 285.

It would therefore at first blush appear that this court could have nothing to do with the determination of the controversies existing between the materialmen, the mechanics, and the laborers on the one side, and the owners on the other side; the first claiming and the latter denying the existence of liens upon the properties of the latter, and that all this court should do would be to collect from the owners the sums due under contract from them to Hobbs & Co. and disburse the amounts thereof among the creditors of this bankrupt firm. In any event, I think it can be assumed at once that no obligation rests upon this court by its process to enforce any such liens against the properties of such owners. But, on the other hand, it is to be remembered that these courts do have jurisdiction to "bring in and substitute additional persons or parties in proceedings in bankruptcy when necessary for the complete determination of a matter in controversy." The touchstone of jurisdiction in such cases is whether it is necessary, in order to fully secure and disburse the bankrupt's assets, to pass upon the rights of other parties. Does such necessity necessarily exist in this case? After earnest thought and consideration of the situation I am driven to the conclusion that it does. Here was a contracting firm, doing a very large business, hopelessly involved, thrown into bankruptcy, with every dollar of its assets locked up and dependent upon the fulfillment of its uncompleted contracts. In each case it had, for a fixed price, contracted with the owner to build, and in each case the owner had right to withhold the contract price or a part of it to secure the building's completion. In each case the debts due these mechanics, materialmen, and laborers were primarily debts contracted by the bankrupt firm and not by the owners. These owners cannot in any event be held personally liable for these debts to these men, while the firm and its individual members were so liable. Only by an express statute of the state can the owners be affected at all by these debts, and that under express conditions and limitations fixed by the statute, by having liens therefor attach to the building upon which work was done or material provided for which was the consideration of the debt. If such lien has attached to the owners' property, he has the right to demand that this contracting firm secure its release by payment, and, if he does not, to withhold from the amount due from him to the contractor sufficient to pay it. Thus it is that this court could not require the owner to pay over to its receivers or trustee the sum due, unless it did so with the obligation upon it to devote the fund as far as it would go to the release of such liens, without violating the sanctity of the contract between the owner and the contracting firm. Under such circumstances, the valid liens attaching to the owners' property become in equity liens upon the funds collected on behalf of the bankrupt contractor from the owner, and such funds must first be applied to the payment of such liens before any general creditors can have any lot or share therein. The conclusion therefore is

inevitable that, in order to make proper distribution of the funds arising under each contract, this court must determine the validity of these claims of liens thereunder. It is to be always remembered that these liens are created solely by the state statute and are against common-law right, therefore full and substantial compliance with the statutory limitations is required to maintain them. It is further to be borne in mind that this court, in construing this statute, will follow the constructions given it by the court of last resort in the state.

The West Virginia statute authorizing these liens is contained in sections 2 to 13 inclusive of chapter 75 of the Code of 1899 of that state, except that section 3 has been very materially amended by chapter 42, p. 132, of the Acts of the Legislature of 1903. The provisions of this statute are, at least, obscure—perplexing, if not to an extent contradictory of each other. Section 2 provides that every mechanic, builder, artisan, workman, laborer, or materialman shall have a lien upon the structure and the lot of ground upon which it stands, constructed, etc., under contract with the owner or his agent; the aggregate of such liens not to exceed the contract price, and no priority to exist between them. Section 3 originally, as found in the Code, provides that materialmen, laborers, etc., performing labor or furnishing material under a contract with a principal contractor or his subcontractor for the construction, etc., of a structure provided for in a contract between its owner and such principal contractor, shall have a lien for such labor performed or material furnished (not exceeding the price for the same stipulated in the contract between such principal contractor or his subcontractor and such materialman, laborer, of mechanic) on the structure and the lot of ground upon which it stands.

That such liens shall have priority over other liens created subsequent to the performance of such labor or the furnishing of such material; that the laborer and mechanic shall have the first lien, and the liens of laborers, mechanics, or persons furnishing material or machinery to a contractor, shall take precedence over the lien taken, or to be taken, by the contractor indebted to them, and all assignments and transfers of such head contractor of his contract with the owner, or by a subcontractor of his contract with the head contractor, and all proceedings in attachment or otherwise against the head contractor or subcontractor to subject or incumber his interest in such contract are made subject to the liens of the laborers, mechanics, and materialmen who have labored upon or furnished material for the constructing, altering, repairing, or removing of such structure under contract with the contractor or subcontractor. The language making these provisions in the original act, found in the Code and in the amended act as found in chapter 42, p. 132, of the Acts of 1903, are identical. The original act then proceeds as follows:

"It shall be the duty of such laborer, mechanic or person furnishing material to file with the owner or his authorized agent an itemized account of the labor done or material or machinery furnished verified by affidavit, within thirty-five days after the same is performed or furnished, and his neglect or failure so to do shall release the owner from all responsibility and his property from all lien for any item therein done or furnished prior to the

said thirty-five days, and the *owner may at any time by notice in writing require such laborer, mechanic* or person furnishing the material or machinery to file with him such itemized account, and the neglect or failure to do so, within ten days after receiving such notice, shall release the owner from all responsibility and his property from all lien for all labor done or material or machinery furnished by the person so neglecting or failing prior to the giving of such notice."

The language in italics is supplied from the note as having been by accident omitted in the engrossed act. It is absolutely necessary to complete the sense. In the amended act of 1903 this clause reads as follows:

"It shall be the duty of such laborer, mechanic or person furnishing material, to file with the owner or his authorized agent an itemized account for the labor done or the material or machinery furnished, verified by affidavit, within thirty-five days after the same is performed or furnished, which said thirty-five days shall be construed to mean that the laborer, mechanic or person furnishing material shall have thirty-five days after he shall have ceased to have performed labor, or furnished machinery or material to file such notice, and that if the notice is given within thirty-five days, as aforesaid, it shall include all items for labor performed or machinery furnished, within a period not exceeding nine months from the date of said notice, to the owner of the property on which the lien is to be charged; and his neglect or failure so to notify the party to be charged within thirty-five days, after he shall have ceased to furnish labor, machinery or material, shall release the owner from all responsibility, and his property from all lien for any item therein done or furnished prior to the said notice; and the owner may at any time by notice in writing require such laborer, mechanic or person furnishing the labor, material or machinery, to file with him such itemized account, and the neglect or failure so to do within ten days, after receiving such notice, shall release the owner from all responsibility, and his property from all lien, for all labor done or material or machinery furnished by the person so neglecting or failing prior to the said giving of such notice."

The section, both in the original and amended act, then sets forth a proviso that any laborer or other person employed to do work or furnish material or machinery for, or to, a contractor may, before doing work or furnishing material or machinery, give notice in writing to the owner, that he will hold him responsible if not paid by the contractor, and, if such notice is given, then the itemized account referred to need not be given unless expressly required by the owner, and the lien will not in any way be impaired by failure to furnish certain itemized accounts. In the amended act forms are given for the itemized account and the notice. Section 4 of the act provides that any lien under sections 2 and 3 shall be discharged unless the party claiming it, within 60 days after ceasing labor or furnishing material or machinery, file with the clerk of the county court a verified account of the amount due after allowing all credits with a description of the property sufficiently accurate to identify it with the name of the owner. Section 5 provides the duty of a clerk to record this account and description, and then says:

"No payment by the owner or his agent to a contractor, shall affect or impair the lien of a laborer, or materialman, provided for in section 3 of this chapter. But such owner may limit his liabilities so that the amounts to be paid by him shall not exceed in the aggregate the price stipulated in the said contract between himself and the contractor, by having the said contract, or so much thereof as shows the contract price, and the times of its

payment, recorded in the office of the clerk of the county court of the county, where such house or other structure is situated, prior to the performance of the labor and the furnishing of the material, or the machinery for the same. But if such owner fails to have said contract so recorded, the contractor shall be held to be his agent and the house or other structure, and the lot on which it is situated, then be held liable for the true value of all labor done and the material and machinery furnished therefor, prior to said recording, although the same may exceed in the aggregate the price stipulated in the contract between the owner and the contractor."

It is next to impossible to attempt to construe and apply this legislation without calling attention to its vicious character, and especially to that portion of it contained in the amended act of 1903. In almost every case, class legislation is to be condemned, and results, practically, in injuring rather than benefiting those for whom it is enacted. I am fully persuaded this legislation, so manifestly intended for the benefit of laborers and mechanics, instead of aiding in the long run will only injure them. In effect, instead of leading them to think and act for themselves, protect themselves when working for a contractor, collect their wages promptly from him as they should do, and cease to labor for him when he falls behind in payment, it lulls them into a carelessness in so caring for their interests, into a fancied security based upon the idea that, no matter how improvident or even dishonest their contractor may be, their labor must and will be paid for by the owner with whom they have no contractual relations and who they may not know, under and by virtue of this law. They pay little attention in consequence, how far the payments of their wage becomes in arrear until the almost inevitable litigation comes, and the expense and loss of time in conducting it usually sacrifices the amount due them. On the other hand, under such law as this, for any one to undertake to build by contract becomes a most serious matter. The state subjects the private citizen to all of its iniquities, but, of course, excepts itself from its effects, for it has been held that no public building can be subject to the provisions of this act. Hall v. Scites, 38 W. Va. 691, 18 S. E. 895.

"Public policy and public necessity" create the ground for such exceptions. The Legislatures enacting such laws as these would seem to regard that little or no conception of the equal rights of citizens as to each other, or the sanctity of their contracts one with the other, is required to be exercised by them in the administration of true public policy and necessity. When a man enters into a contract with another to build him a house, mutual obligations arise under the contract, the one to build, the other to pay, and if the contractor expends his money and labors in erecting the building, as by the contract he has bound himself to do, and which if he fails to do he can by the contract be compelled by law to do, or else to answer in damages for such failure, it is well that he should be secured in the payment by the owner with a lien on the building and the ground upon which it stands, to the extent of the contract price, but, when such contractor, after having so bound himself with the owner is then permitted to hire whom he pleases, good workmen, bad workmen, lazy workmen, or worthless workmen, without interference from the owner and whom

the owner may not know, make reasonable or unreasonable contracts with them for their wages, buy in like manner and with like non-interference from the owner, his material from all parts of the country, his sash and doors from Chicago, his nails from Wheeling, his plaster from Pittsburg, his lumber from North Carolina and Michigan, and all from men the owner never did and cannot know and at prices over which he cannot have control; for this to be done with no other or further agreement on the owner's part than to pay a specified sum or sums for the building completed or partially so, as the case may be, and at a specified time or times to the contractor and to him only and then have this law step in and announce that his solemn contract did and could do no more than constitute this contractor his agent, and that, if such contractor has failed to pay the money paid over to him by such owner, as required by the terms of the contract, to these laborers, mechanics, and materialmen, with whom such owner has no privity by contract or otherwise, and whose whereabouts he may not know of, that in that event his building and ground is to be subject to pay all these debts of the defaulting contractor, no matter how much their sum total may exceed his contract agreement, is nothing short of the grossest outrage, to say the least of it. This outrage has been accentuated by the act of 1903, which was apparently enacted for the express purpose of permitting this species of "plucking" and despoiling the owner to continue for a period of nine months, and it would almost seem in order that he may be punished good and hard for his temerity in undertaking to build at all. Section 5 of this statute, however, after providing that payment by the owner to a contractor shall not effect or impair these labor and material liens, does say that the owner may limit his liability in amount to the contract price, provided he record the contract, or so much of it as shows the contract price and the terms of payment, in the office of the clerk of the county court of the county, prior to the performance of such labor or the furnishing of such material, but it further provides, if this recordation is not made, the contractor is to be held as agent for the owner, and the lot and house of such owner is to be liable for the labor and material demands, no matter how much exceeding the contract price.

If it were an original proposition presented for the first time to me, or even if it was absolutely necessary for me, in order to settle the questions here, to pass upon this section directly, I do not think I would hesitate a moment in holding the latter clause of this section to be in direct violation of constitutional inhibitions against invalidating contracts. A wayfaring man, though a fool, well knows that no man, in contracting with another to build his house, intends to constitute that other his agent with power to create against his property debts to an unlimited degree, and without his knowledge, and it seems to me no Legislature, no matter how consuming its desire to truckle to classes, ought to be permitted to declare such contract to be so. In this case the Davis & Elkins College Corporation did record its contract before labor performed or material furnished, but it is earnestly contended that this contract had not been acknowledged by

the parties before recordation, and is subject to all the requirements of the recordation acts relating to deeds and other conveyances of title in this respect, and therefore is in fact an "unrecorded" paper. There is nothing in this contention. Fortunately all papers do not have to be acknowledged before recordation in the county clerk's office, and the very language of this section requiring only the clauses giving the contract price and the times of payment to be recorded clearly shows that these building contracts are of this class. Wagon Co. v. Hutton, 53 W. Va. 154, 44 S. E. 135. Certain it is that in the interest of common justice the effect of the provision limiting the owners liability by his recordation should be given the widest and fullest scope, and I have no hesitancy in saying that these labor and materialmen's liens should not by any court be enforced against the building of this corporation beyond the balance of the contract price still in its hands or in the hands of the special receivers of this court who may have collected such balance from such corporation. This balance, however, whatever it may amount to, after making it contribute its proportionate share of the costs incurred in this proceeding, should be applied to these liens—first to the labor ones, and the balance pro rata to those for material. That it may be so applied, I must ascertain what ones of these liens conform to the requirements of this statute, and I now do ascertain, from the master's report and the evidence filed with it, them to be as follows: First, the labor liens: Floyd Triplett, $47.50; Alfred Phares, $22.50; J. C. McDonald, $33.25; L. Sturm, $47.50; Wm. Herron, $37.50; W. H. Head, $32.50; C. A. Poling, $46.25; Ward Lewis, $36.75; J. M. Knapp, $45; J. O. Johnson, $45; J. A. Moore, $36.25; W. A. Allensworth, $55; Theodore Mayer, $37.50; Fred Hoffman, $29.75; J. A. Kelley, $47.50; Thomas Haines, $76. Second, the liens for material: Kane & Keyser Hardware Company, $2,084.36; Collins Company, $2,690.07; Kelley & Jones Company, $2,779.40; Fairmont Wall Plaster Company, $32.10; Elkins Planing Mill Company, $283.80; James E. Hanley, $1,378.70; L. C. Wolf, $1,374.46; and the D. M. Anderson, Mariner, Son & Co., $1,593.75. The objection made to the first seven above-named material liens are technical in character, going to the question of these people being subcontractors, their accounts not being properly itemized, and their notices improperly served. I think all these objections should be overruled. I have sustained the exception taken by the D. M. Anderson, Mariner, Son Company, and allowed this lien, following the very recent cases of Grant v. Cumberland Valley Cement Co., 52 S. E. 36, decided October 31, 1905, by the Supreme Court of Appeals of West Virginia, and Rainey v. Freeport Smokeless Coal & Coking Co., 52 S. E. 473, decided by said court on November 28, 1905. These cases were not out when Special Master Shirley made his report. They seem to be directly antagonistic to the former holdings of this court as set forth by such cases as Mertens v. Tile Company, 53 W. Va. 192, 44 S. E. 241, and Niswander v. Black, 50 W. Va. 188, 40 S. E. 431, which manifestly the special master followed, but they are the latest rulings of this court, although in my judgment not the soundest, upon this subject, and for that reason

will be followed by me. I agree with the master that the lien asserted by K. G. Lyon cannot under any of these cases be sustained, and I have disallowed it.

The Cobb contract was not recorded, and it is not necessary, as I have said, to finally pass upon the question whether the laborers and materialmen, by complying with the terms of this statute, can hold Cobb's property liable for any sum beyond the contract price. To settle that question would be to exceed this court's jurisdiction in the premises. It is beyond peradventure that Hobbs & Co. could not collect from Cobb a sum greater than the contract price. Therefore the trustee in this bankruptcy case can collect no sum in excess of the unpaid balance of such contract price. This balance represents the sum total of the bankruptcy firm's assets due from and in the hands of Cobb, and, as Cobb could not be required to pay over this balance without being indemnified to the extent thereof to the release of proper liens against his property growing out of the building contract, it is my duty to pass upon and decide what are proper liens and apply this balance to them. As a credit upon these liens, the gross sum of this balance is applicable, but it is to be reduced as to such lienors to the extent of its proportionate part of the costs of this and the bankruptcy proceeding. This applies to the balance due from the Elkins College Corporation and the other balances due under the Cook Hospital and Watson contracts hereinafter to be considered. In other words, these balances, as assets of Hobbs & Co., are due these lienors as creditors of Hobbs & Co. The costs of these proceedings must be taken and paid from such assets to the loss pro tanto of the creditors, but not to the loss to any extent of the owners who are to be considered only as holders of the funds for their own protection and indemnity. In this instance there are no labor liens to be paid in full as first in priority. The materialmen and mechanics who have filed liens, in my judgment conforming to this statute, against the Cobb building, are as follows: Kane & Keyser Hardware Company, $2,711.11; Kane & Keyser Hardware Company, $46.84; the Elkins Planing Mill Company, $412.98; the Randolph Company, $299.24; and L. Creed Wolf, $458.53. I think the objections made upon technical grounds to these liens should be overruled, and I agree with the special master that the D. M. Anderson, Mariner, Son Company claim for $184.87 cannot be upheld as such a lien. Touching the trust lien for $10,000 due to A. B. Serpell I do not regard it necessary to pass upon it in any way. It is a lien upon this property, but wholly independent of this building contract and amply secured. It ought not to participate in this distribution of this balance due from Cobb to Hobbs & Co., under the building contract, because it is not Hobbs & Co.'s debt but Cobb's, and Cobb is not in bankruptcy nor subject, in the settlement of his affairs, to that court's jurisdiction. The validity of this trust lien is to be therefore regarded as in no way affected or impaired by this proceeding.

The contract of Jno. R. Cook and the Cook Hospital & Training School Company with Hobbs & Co. was not recorded. The contract price was paid in full, but a claim was advanced by Hobbs & Co. for

extra labor. The extra labor was conceded, but the price demanded first was resisted as excessive. The special master has investigated this matter fully, and I agree with his conclusion that $3,200 is a fair value. for this extra labor; $1,200 of this had been paid, leaving a balance of $2,000 due from this hospital company. There are no labor liens demanding payment in full as first in priority under the terms of the statute. I ascertain and decide that the following materialmen and mechanics have complied substantially with the requirements of this statute and are entitled to share pro rata in the distribution of this $2,000 balance after the payment from it of its proportionate share of the costs, as hereinbefore set forth: The Electric Supply & Construction Company, $1,088.47; A. M. Knight, $50.28; Reed Plumbing Company, $3,197.29; Charles D. Hough, $118.89; S. H. Calkins Company, $1,117.58; and Dickerson Building Supply Company, $66.40. I have carefully considered the objections made to these claims on technical grounds and agree with Special Master Shirley that they must be overruled, under the state decisions I have heretofore cited.

Hobbs & Co. entered into two separate and distinct contracts with C. W. Watson; one to remodel a residence property at the price of $22,398, increased by extras to $24,908.33, the other for the erection of a stable or barn at the price of $19,636, increased by extras to $19,886. The ground upon which these buildings stand belongs to said Watson's sisters, Ida M. and Lucy L. Watson. C. W. Watson made these contracts in his own name, neither was recorded. Being a man of large means, it may have been his purpose to erect these buildings on the old homestead for his sisters at his own expense. In fact his statement in his answer that he acted independently of his sisters in this matter seems to me conclusive from the high character and probity of the man. However, the evidence discloses that he has always conducted the business affairs of these sisters of his, that no objections were at any time made by them to the erection of these buildings upon their ground, and that they had full knowledge of the character and plans of the buildings and of the building operations. These sisters and C. W. Watson live together. Under these circumstances I think the special master was right in concluding that, so far as these mechanic liens were concerned, the law from the circumstances would assume C. W. Watson to have acted in legal effect, as agent for these owners in the making of these contracts. Under the contract for the residence property a small balance of $751.24 remains. This sum, after deducting its share of costs in the manner heretofore directed in respect to the other funds, should be disbursed pro rata upon the mechanic and material liens complying with the requirements of this statute. These I ascertain to be the Collins Company, $1,805.05; D. M. Anderson, Mariner, Son Company, $1,736.73; John F. Phillips, $593.57; Charles D. Hough, $743.29; Kelley Brothers, $152.20; Reed Plumbing Company, $459.98; and Hamilton & Hoffman, $452.41. I think the special master right in rejecting the claims of the Dickerson Building Supply Company for $192.30 and of Allen & Son for $92.07, on the ground that these claimants undertook

to take their lien on property not involved in the contract, under the ruling in Mertens v. Tile Company, 53 W. Va. 192, 44 S. E. 241. I have disagreed with the special master who rejected the claims of the Collins Company, the D. M. Anderson, Mariner, Son Company, and parts of the claims of John F. Phillips and Kelley Bros. His action was based upon the ruling in Niswander v. Black, 50 W. Va. 188, 40 S. E. 431. I base my action upon the later cases of Grant v. Cement Co., and Rainey v. Coal Company hereinbefore cited, in which the Supreme Court of Appeals of the state seems to have almost abandoned their former rule of strict construction. I am not in sympathy with them, but follow them. Touching the contract for the Watson stable it is sufficient to say 'that not a dollar balance remains of the contract price. All has been expended, and besides near $3,000 additional was required to be paid by Watson to complete the structure according to the requirements of the contract.

It is wholly unnecessary for this court therefore to further consider this contract or attempt to pass upon the validity of the liens claimed. If these are to be enforced at all, it must be in another court, and under the iniquitous last clause of section 5 of this statute, which I could not and will not sustain until directed by a higher court having power to control my action. The matter touching the dealings between Hobbs & Co. and Showalter injected into this proceeding does not belong here. The demand is a disputed one not involving special liens which the referee in the bankruptcy proceeding proper should ascertain and settle.

A decree should be entered in this cause referring it to the referee in bankruptcy to be heard by him in connection with the original proceeding, and directing him to have the trustees in bankruptcy collect the balances of the funds from the parties as set forth in the special master's report herein, and cause such funds to be disbursed in the manner and to the parties as set forth herein, and to proceed in all respects as in this opinion directed. As said referee and the special master are the same person, and it will be embarrassing for him as referee to ascertain and fix his own compensation as special master, I think such decree should fix such compensation. The labor in this case done by the special master has been enormous. It was before him for sixteen months, during which time he worked almost constantly upon the matters involved. He has taken a very large amount of testimony. He has been heretofore allowed by order of this court a part payment of $500, and I have determined to allow him $500 additional compensation, and the sum of $245 actually expended by him in expenses. The other costs and the compensation of the receivers, the referee, being in no way interested in, can very properly ascertain and fix, subject of course to revision, if it should, when fixed by him, be asked by parties in interest.